**FARNET v. DeCUERS et al.**

**No. 17397.**

Court of Appeal of Louisiana. Orleans.

May 6, 1940.

Rehearing Denied June 4, 1940.

See 196 So. 538.

798

John B. O'Connor and Spearing, Mc-Clendon & McCabe, all of New Orleans, for appellants.

Alexander E. Rainold, of New Orleans, for appellee.

JANVIER, Judge.

At about 11:40 o'clock on the night of August 17, 1939, Edwin L. Farnet, the plaintiff, sustained personal injuries in an automobile collision at the intersection of Bayou Road with North Claiborne Avenue in New Orleans. He was a guest passenger in a Plymouth coupe which belonged to the Louisiana State Board of Health and which had been assigned to one of the defendants, Donald DeCuers, an inspector employed by the said Board. The Plymouth was on its way across North Claiborne Avenue from the river towards Lake Pontchartrain when it came into collision with a Ford sedan owned by Miss Carrie Vead and operated at the time by her brother, Ardoin Vead. The Ford was being driven up the lake side roadway of Claiborne Avenue towards Canal Street. In it with Vead were Miss Annabella Coupel, on the front seat, and Miss Laura Mae Darce, Miss Carrie Vead, the owner of the automobile, and Ernest Roy. The Plymouth was driven by DeCuers. Farnet was sitting on the right side and between him and DeCuers was Mrs. DeCuers.

Farnet claims that the collision was due to fault on the part of DeCuers in attempting to cross Claiborne Avenue, a boulevard, without coming to a complete stop before entering the intersection of the first roadway, in continuing across the neutral ground, and in failing to stop at the lake side roadway to yield to the Ford the right of way to which it was entitled, and in attempting to cross in front of it when it was too near to the intersection.

Farnet avers that the said DeCuers is liable for the results of his carelessness and that, since he was operating the car with

the permission of the owner, to-wit, the Louisiana State Board of Health, the United States Fidelity & Guaranty Company, liability insurance carrier of the said, Board, is also solidarily liable because of the fact that the insurance policy contained what is generally termed an "omnibus clause", under which the insurer agrees to extend the protection of the policy to any person operating the car with the permission of the named assured. It is asserted that, because of this stipulation and because of the provisions of Act 55 of 1930, plaintiff may proceed directly against the said liability insurance carrier of the said Board.

The insurance company, under protest, first filed an exception of lis pendens, averring that it had already filed in the United States District Court for the Eastern District of Louisiana a suit in which it had made all interested persons parties and in which it had sought to have that court render a declaratory judgment sustaining its contention that, under the circumstances, the protection of the policy was not extended to DeCuers. This plea was overruled and the insurance company and DeCuers filed separate answers in which both denied that DeCuers had been in any way at fault and in which both maintained that the negligence of Ardoin Vead had caused the collision. The insurer also asserted its freedom from liability in any event because of the alleged fact that DeCuers, at the time of the accident, had not been operating the Plymouth with the permission of the assured, the Louisiana State Board of Health.

There was solidary judgment against both defendants in the sum of $7,704.64 and from this judgment the insurer has appealed suspensively and DeCuers has appealed devolutively.

The first inquiry must, of course, be into the question of whether DeCuers was guilty of any fault which had causal connection with the accident, for, if he committed no such fault, then neither he nor defendant insurer is liable, whereas if he was at fault and that fault contributed to the occurrence, then DeCuers, at least, is liable, and there will remain only the question of whether the insurer, under the facts shown, is liable under the so-called "omnibus clause" of the policy.

Claiborne Avenue and Bayou Road intersect almost at a right angle. The former is one of the widest streets in New Orleans, running in an uptown-downtown direction, and having in its center a neutral ground 111 feet in width and a paved roadway on each side. Bayou Road is a much narrower street—26 feet in width—and with no neutral ground. By the city traffic ordinance, No. 13,702 C. C. S., vehicles on Claiborne Avenue are given the right of way over those on intersecting streets, and the Ford, approaching from the right of the Plymouth, because of another provision in the ordinance, would have been entitled to the right of way even if the streets had been of equal rank.

DeCuers states that, as he reached a point a little beyond the center of the neutral ground, he saw the Ford on its way up Claiborne Avenue and that it was then about 160 to 190 feet below the intersection. He says that he was driving his car at about fifteen miles per hour and that, though he could not accurately judge the speed of the Ford, he realized that, if it was going at a reasonable rate, he could cross that side of Claiborne Avenue before it could reach Bayou Road. He claims that, in fact, he did almost cross the roadway on which the Ford was approaching and that it struck his Plymouth near its rear, after its front had crossed the curb line on the right-hand side of Claiborne Avenue.

Vead, on the other hand, says that as the Ford, under his control, approached the intersection, he did not see the Plymouth because, between him and it were other cars which were parked along the end of the Claiborne Avenue neutral ground, between the two roadways and to the right of the Plymouth. He says that just as he was about to enter the intersection the Plymouth, at a speed of about 22 miles per hour, emerged into Claiborne Avenue in front of the Ford, when it was no longer possible for him to stop.

After the impact the Plymouth continued into Bayou Road, almost crossed that street, and turned partially around, whereas the Ford came to a stop only a foot or so beyond the point at which its front had struck the Plymouth.

There is considerable conflict in the evidence concerning the exact spot in the street at which the collision occurred, plaintiff maintaining that it was rather near to the neutral ground and defendants declaring that it was near the other curb. There are pointed out by some of the wit-

nesses several facts which lead us to believe that the Plymouth, when it was struck, was crossing in front of the Ford at a rather fast rate. First, it is significant that it proceeded for a considerable distance after the collision, and, second, it is an interesting fact that the right door of the Plymouth was swung open as a result of the impact. If the Ford had struck the side of the door of the Plymouth with any great force, it seems certain that that door would have been crushed in and that it would not have swung open. This phenomenon seems to be explained by the fact that at the rear of the door, which opened towards the front of the car, are hinges, the lower of which extends some 2 or 3 inches beyond the side of the car. A photograph shows the mark of the impact and it seems rather certain that the Ford struck this rear hinge just as the Plymouth was crossing in front of it. The forward movement of the Plymouth had the effect of exerting a leverage on the end of the hinge and this, after pulling the latch away from the front end of the car, threw the front end of the door out and opened it.

These various facts and the record as a whole lead us to believe that DeCuers drove out into the intersection directly in front of the oncoming Ford and that his speed was greater than it should have been under the circumstances. It was not as though he had entered the intersection sufficiently in advance of the Plymouth to permit it to be said that he had preempted the intersection, and, if he did not so enter it in advance, then he was at fault, for the other car was entitled to the right of way, as we have already shown.

We conclude, therefore, that DeCuers was at fault and that this fault was, at least, a contributing factor. The necessary result is that he is liable and we therefore must investigate the very interesting question which is posed by the fact that the policy contained the "omnibus clause" and that it is charged that, at the moment of the accident, DeCuers was engaged in a venture in which the assured named in the policy—to-wit, the Louisiana State Board of Health—was in no way concerned, and for which it, through its proper officials had not given consent that the car might be used.

The so-called "omnibus clause", as it appears in the policy with which we are concerned, reads as follows: "The unqualified word 'Insured' wherever used in Coverages A and B and in other parts of this policy, when applicable to these coverages, includes not only the Named Insured but also any person while using the automobile and any person or organization legally responsible for the use thereof, provided that the declared and actual use of the automobile is 'pleasure and business' or 'commercial', each as defined herein, and provided further that the actual use is with the permission of the Named Insured. * * * ".

We call attention particularly to the word "actual" as it appears in the last quoted proviso—"that the actual use is with the permission of the Named Insured". For some years there had been inserted in automobile liability policies an omnibus clause similar to that quoted above, but not containing the word "actual"—in other words, stipulating that the coverage of the policy should be extended to the user provided the use should be with the permission of the named insured. In a majority of American jurisdictions it had been held that such a clause did not afford protection to the user unless the use to which the car was being put at the time of the accident was the use contemplated when the initial permission to use the car was granted; that, if an owner granted permission to a user to take a car for a particular purpose and the user should undertake some mission other than that contemplated, the protection of the policy should not attach during the accomplishment of this other purpose or mission; that a servant who might be sent by his employer to perform a certain errand would be within the protection of the policy while on that errand, but would not be within its coverage if he should undertake an errand or purpose of his own.

This majority view, however, was not followed in Louisiana, and here it was held that all that is necessary under such a clause is that the initial permission be obtained, after which there is coverage whatever may be the use to which the automobile is being put at the time of the accident. Thus, in Parks v. Hall, 189 La. 849, 181 So. 191, 194, our Supreme Court said: "We therefore conclude that the *permission of the assured* to Hall *to use the car in the first instance*, irrespective of the use to which he put the car while

in his possession was *'permission of the assured' within the meaning and contemplation of the 'omnibus clause'* and the insurer is therefore liable to plaintiffs thereunder." (Words italicized by Supreme Court.)

It was not the purpose of the insurers to afford so unlimited a protection to users of automobiles of others and therefore a new form of "omnibus clause" was designed to accomplish the result which our Supreme Court and certain other courts in this county had held had not been accomplished by the clause originally used and not containing the word "actual". Accordingly, the said companies adopted the "omnibus clause" as it appears in the policy which is involved here and which we have already quoted. This clause, it will be noted, requires that, in order that the coverage be afforded to the user, the "actual use" must be "with the permission of the named assured". Thereafter we were confronted with the case of Haeuser v. Ætna Casualty & Surety Company and, on first consideration, concluded—one of the members of this court dissenting—that, whatever may have been the doctrine in this state based on the clause as originally worded, the insertion of the word "actual", in the light of the history of the clause and of the pertinent jurisprudence, justified the view that the intended object had been accomplished and that, in order that the protection of the clause be extended to a user, not only must he initially obtain permission, but he must, at the time of the accident, be using the car for the purpose actually contemplated when the permission to use was granted. See La.App., 185 So. 493. However, on rehearing, this court—the author of this opinion dissenting—changed its view and held that the insertion of the word "actual" had accomplished no result whatever and that, even under the clause as it appears here, all that is necessary is that the user obtain the initial permission of the owner to use the automobile. See Haeuser v. Ætna Casualty & Surety Company et al., La.App., 187 So. 684. The Supreme Court refused to review this holding and, accordingly, the doctrine of that case is controlling in this state at this time.

There can be no doubt that DeCuers, initially, was authorized to use the car which was assigned to him and that, accordingly, he was within the protection of the policy, although, at the time of the accident, he was using the car purely for his own purposes—i. e., taking home a friend from a social evening at the home of a mutual acquaintance.

We think it well to review briefly certain facts bearing upon the exact purpose for which the car was being used at the time of the accident. The record shows that, though DeCuers had been instructed not to use the car except on business of the Board of Health, he had, as a matter of fact, customarily used it for his own purposes, and the record shows, also, that he was instructed to store the car at night in a public garage selected by the Board of Health. During the afternoon of the day on which the accident occurred, having finished his work for the day, he parked the car in front of his home at about 1:30 p. m. On that evening he attended a social affair at the residence of a neighbor living next door, leaving his car in front of his own home, where he had parked it in the afternoon. While at this social affair, he met Farnet, and, as Farnet was leaving, DeCuers suggested that he would be glad to drive him home. It was while he was driving Farnet home that the accident occurred.

Even in the light of the doctrine announced in the Haeuser case, we doubt whether we would conclude that the "omnibus clause" should cover under such circumstances were it not for the additional fact that DeCuers testified that, in addition to taking Farnet to his home, he intended afterwards to park the car in the garage where it was customarily stored over night. His testimony on this point is as follows:

"Q. You left the car parked out in the street all night long? A. No; I put it in the garage.

"Q. That night? A. I would have to put it in the garage.

"Q. You would have to put that car in the garage that night before going to bed? A. Yes.

"Q. Where were you with Mr. Farnet? Next door to your home? A. Yes; Mr. Moustier's house.

"Q. Mr. Moustier's house? A. Yes, sir.

"Q. And then you took Mr. Farnet home? A. Yes.

"Q. And you were going to put the car up in the garage? A. That is right; yes.

\* \* \* \* \*

"Q. Do you keep the car at your home? A. No, sir.

"Q. Keep it in a public garage? A. Yes, sir."

■ Even the doctrine of the Haeuser case would not extend so far as to require a holding that an employee, after putting away the employer's automobile, could again take it out entirely for a purpose of his own and yet obtain the coverage and protection of such an "omnibus clause". We think that it is necessary that he must, at the time of the occurrence, have actually taken the car for some purpose contemplated by the owner and that it is only when he steps aside from the accomplishment of this purpose that the "omnibus clause" affords protection. But we think that, under the circumstances here, since it was his ultimate purpose to put the car in the garage, when he took it from the curb where he had left it in front of his home he did so "with the permission of the named insured" [185 So. 495] since he intended ultimately to put it where it should be— that is, in the designated garage.

It is strenuously argued on behalf of defendant that there could have been no permission of the named insured to use the car for such a purpose since the named insured is a public board created by law, with no legal authority to grant permission for any uses except those contemplated by law, and that, since Article IV, Section 12 of the Constitution of 1921 prohibits the private use of public property, it follows that there can be no such permission on the part of the Board of Health except for the uses contemplated by law.

■ This is, of course, true. But the argument loses sight of the fact that the whole theory on which the doctrine of the Haeuser case is founded is that it is only the initial permission which is necessary and that, after that is given, it is of no importance whatever whether the use to which the automobile is put at the time of the accident be that contemplated or not. It is obvious that the initial permission which DeCuers had to use the car was legal permission, which the Board of Health itself, through its officials, had the right to extend to him. Since it had the legal right to extend to him permission to use the car and since it had extended this permission, it is unimportant that, at the time of the accident, he was not using it for a business purpose contemplated by that permission but was using it for purposes of his own pleasure.

■ And the use of the word "pleasure" calls to mind an additional argument which is made by defendant and which is very similar to that which we have discussed, and that is that, under no circumstances can a business automobile of any public board or body be legally used for pleasure. But this argument overlooks the fact that the policy itself provided that it was contemplated by the insurer, when the policy was issued, that the automobile might be used for business or pleasure, for in the policy it is so stated. Therefore, since the insurer, when it issued the policy, agreed that the automobile might be used for business or pleasure and that it would extend the protection to the user of the automobile whether the use be for business or pleasure, it cannot now be heard to say that there was no legal right in anyone to use the car for pleasure, and therefore there could be no coverage while it was being so used.

In a case remarkably similar, this exact question was presented to the Appellate Division of the Supreme Court of New York (see Fox v. Employers' Liability Assurance Corporation, Ltd., 243 App.Div. 325, 276 N.Y.S. 917, 922) and there, as here, it was contended that the insurer, by inserting in the policy the statement that the car would be used for business or pleasure, had estopped itself to contend that the coverage was not extended to one who might use the car for pleasure. The court there reached a conclusion different from that which we have reached and said: "It is claimed by the plaintiffs that item 6 of the policy, which states that the purposes for which the insured automobiles are to be used include 'business and pleasure,' shows an intent on the part of the defendant to insure the driver of the car while using it for his own pleasure or individual convenience. Ordinarily a corporation, municipal or otherwise, can have no pleasure, and, when the word is applied to a corporate body, it is meaningless. But the city maintains parks and playgrounds for

the entertainment and pleasure of the public, and motorcars are necessarily used in that connection. It may well be that the city, in taking out this policy, and in its desire to cover its liability from every possible angle, caused the word 'pleasure' to be inserted as one of the purposes for which the insured cars were to be used, in order to include their use while employed in connection with any park or playground activity. I do not think that it can be said that this provision shows any purpose on the part of either party to the contract to cover a situation where some city employee takes the car, without authority from the municipality, and uses it for his own personal pleasure."

We find it difficult to agree with the conclusion set forth because we feel that, if the employee to whom the car had been assigned was under the duty of inspecting "parks and playgrounds for the entertainment and pleasure of the public", while making such inspections he was using the car not for pleasure, but strictly for business. But nevertheless, and even conceding that the reasoning which we have above quoted is sound, it is not applicable here because here it is not shown that there was any duty whatever imposed upon DeCuers which could, by any stretch of the imagination, be contemplated within the word "pleasure".

Counsel for defendant-insurer call attention to the fact that the case of Fox v. Employers' Liability Assurance Corporation, Ltd., supra, was affirmed by the Court of Appeals of New York (the highest appellate court of that state). In affirming that decision the Court of Appeals said: "The Appellate Division construed the policy as insuring the operator of the city car only when he was lawfully * * * using it * * * with the city's permission, express or implied; and held that there was no evidence to support a finding that the car at the time * * * was being used in the city's business or was being driven by Green with its consent." See 267 N.Y. 609, 196 N.E. 604.

This merely evidences the fact that New York is one of those jurisdictions which follow the majority view that such an "omnibus clause" affords no protection to a user of an automobile unless the use to which it is being put at the time of an accident is one of the uses contemplated when permission to use is initially given. As we have already shown, Louisiana is among those states in which the other view has been adopted.

■ We conclude on this point that, since DeCuers intended to return the car to its garage after using it on the occasion in question, it should properly be said, under the doctrine of the Haeuser case, that the "actual use" to which it was being devoted at the time was "with the permission of the named insured"; that, consequently, DeCuers was within the protection of the policy, and that consequently, also, the plaintiff, Farnet, because of the provisions of the policy and because of the provisions of Act 55 of 1930, may obtain judgment directly against the said insurer.

It thus becomes necessary that we consider the extent of the injuries and sufferings of Mr. Farnet. According to Dr. E. P. A. Ficklen, a well-known surgeon of this city, he sustained "fractures of the right clavicle, or collar bone; fractures of the right humerus, or arm bone; fractures of the left tibia, or shin bone; fracture of the left patella, or knee cap; fracture of the left oscalsis, or heel bone" and also a fracture of the frontal bone. He was taken to the Charity Hospital, where he remained for fifteen days. On the advice of Dr. Ficklen he was removed to the Baptist Hospital, remaining there between three and four weeks. Dr. Ficklen says that the injuries were excessively painful. It was necessary that his arm be placed in an "airplane" cast for some time and the evidence shows that this is not only painful, but extremely annoying. It is shown that there has been only a partial restoration of the function of the right arm and of the left leg. It appears that, at the time of the trial, it would have been impossible for him to have undertaken the work in which he had been formerly employed. He was a sugar sampler and was required to be more or less active in obtaining samples in warehouses, docks, ships, and similar locations. When asked how long it would be before he would return to work, Dr. Ficklen answered: "If he were given a purely sedentary job, he might be able to hold it in a manner; however, if he had to do much walking, I really don't know what his muscular capacity is now."

The bill of the surgeon was $800 and there is no evidence to show that this charge is unreasonable. The bill of the anaesthetist was $25, the hospital bill

amounted to $162.64, and he expended for nurses, while at the Charity Hospital, $28, making a total of $1,015.64 in addition to the amount to which he is entitled for his suffering, loss of earnings and future disability.

It appears that he earned $100 per month prior to the accident and has been able to do no work since.

The amount awarded below was $7,-704.64. This was obviously arrived at by allowing plaintiff $6,500 for disability, suffering, etc., $1,015.64 for actual medical, hospital and other expenses, and $189 which was by agreement fixed as the amount which must be turned over to the Charity Hospital of Louisiana for hospitalization and services rendered to Mr. Farnet while he was in that institution. While the Charity Hospital did not intervene, we find in the record an agreement that any judgment which might be rendered in favor of plaintiff should be increased so as to include this amount, $189. There is in the record an additional agreement that the plaintiff will remit $50 of this additional amount, but we are not concerned with that stipulation.

The $6,500 allowed for disability, suffering, etc., is, we think, obviously not excessive.

It is therefore ordered, adjudged and decreed that the judgment appealed from be and it is affirmed, at the cost of appellants.

Affirmed.